JAMES WILSON, plaintiff in error, *v.* JAMES CAMPBELL, defendant in error.

*Error to Lee.*

A mere agreement to form a partnership does not, of itself, create a partnership. The parties must enter on the execution of the agreement before the relation of partners exists between them. While the agreement remains executory, if one of them refuses to carry it into effect, the only remedy of the other is by an action at Law for the violation of the agreement, or by a bill in Equity to enforce specifically its performance.

THIS was a suit in Chancery, commenced by James Campbell against James Wilson, in the La Salle Circuit Court, by bill filed on the 10th of July, 1840, and on the 16th of November, 1843, by agreement removed to the Lee Circuit Court.

The bill in Chancery stated in substance, that in the spring of 1838, said Campbell and Wilson entered into an agreement wherein said parties, in order to secure an interest in some contract with the State of Illinois for work upon the Central Rail Road, at the letting of the same by the State, agreed each to join with some other company, and put in their bids in connection with such company, at the regular lettings of such work by the State, and in case either suc-

ceeded in connection with any such company, the other party was to have one half the interest so obtained; and as said parties were jointly interested in a contract for work on the Illinois and Michigan Canal, it was further agreed that the unsuccessful applicant should superintend the work on the Canal, and the successful applicant the work on the Rail Road; that the superintendence of each should be deemed equivalent in value, and that when said contracts were finished, each should share equally in the profit or loss upon the same, as the case might be.

The bill further stated that at such letting, in June, 1838, said Wilson, in connection with others, to wit : N. W. Manville, H. L. Owens, H. C. Perry, —— Weed, and Fairchild Weed procured a contract on said Rail Road, and that they proceeded with the work upon the same, said Wilson superintending the work on the Rail Road, and said Campbell that on the Canal, and that each had an equal interest therein; that subsequently to June, 1838, said Wilson sold out to said Campbell and one McFarrin, for $1100, all his interest in the Canal contract, and for which he was paid in full ; at the same time, it was privately agreed that said Wilson should return one half of all the interest, being one half of the whole contract, meaning that said Wilson should have one quarter of all the profits on said contract.

The bill then alleged, that the reason for such private agreement, was to enable said Wilson to procure from said McFarrin and Campbell, the goods and stores necessary to carry on the Rail Road contract, without exciting the jealousy of said McFarrin, and also to enable said Wilson and Campbell to obtain means to commence said work on the Rail Road, by selling to said McFarrin a portion of the Canal profits ; that in February, 1839, said Campbell sold out all of his and Wilson's interest in the Canal contract to McFarrin for 1000 dollars, and that he, Campbell, took a sub-contract on the Rail Road with the consent of, but unconnected with said Wilson, without affecting his interest in said Rail Road contract. The bill then averred that all such bargains, sales, &c., were made in good faith, and with the consent of Wilson, and with

the understanding that they were equal sharers and partners in the Rail Road and Canal contracts. Complainant then stated his readiness and desire to account and settle with Wilson, but that Wilson would not, and denied owing any thing to him. Complainant further averred, that at the time the Rail Road contract was given up on account of the stoppage of payment by the State, the amount of profits due to said complainant and Wilson on the same, was at least $8,000, and he believes $12,000, the whole of which was received by Wilson, and to one-half of which he was entitled; that said Wilson refused to pay the same, or any of it, and refused to account. The oath of the defendant was expressly waived, and then followed a list of interrogatories, and the usual prayer for relief, &c.

On the 14th of November, 1840, a demurrer was filed, and afterwards, on the 28th of January, 1842, an answer was filed, of which the following is an abstract: Defendant admitted that himself, Campbell and McFarrin were interested in the Canal contract; that they had several times applied for work on the Central Rail Road, but without success; and that a short time before the letting spoken of, Wilson and Campbell had a verbal understanding that if either of them should obtain work, the other should have the privilege, if he thought proper, of becoming equally interested with him who was successful. He denied that there was any agreement that the superintendence of one on the Canal should be equivalent to that of the other on the Rail Road, but admitted that he agreed with said Campbell and McFarrin, to allow them for the time that he spent, less, upon the Canal, than said Campbell and McFarrin.

He admitted, that in June, 1838, in connection with Manville and others, they entered into a contract with the State for work on the Central Rail Road, and proceeded with their work on said Rail Road. He admitted the sale of his interest in the Canal contract for $1,100 to Campbell and McFarrin, but denied the private agreement alleged in said bill. He stated, that upon entering into such sale of his in-

terest in the Canal contract, Campbell expressed some unwillingness to pay the amount, he proposed to said Campbell that if he did not make the $1,100 and wages he would pay back the deficiency provided Campbell would agree to give him one-half the profits over and above the sum of $1,100 and Campbell's wages. He denied that his reasons for selling were truly stated in said bill, denied that Campbell ever advanced a single dollar to carry on the work on the Rail Road contract, or that his, Campbell's, name was ever used in connection with it to raise funds for its construction. He alleged, that soon after this sale he had a settlement with McFarrin and Campbell, and it was proved that they were indebted to him in the sum of $2,800, and that the goods and stores furnished him by said Campbell were to go in liquidation of said indebtedness, and were not an advance made to carry on the work. He believed Campbell sold out to McFarrin his interest in said Canal contract, for $1,000 in February, 1839, and took a sub-contract on the Rail Road, but denied that he, Wilson, had at that time any interest in the same. He admitted that the work on the Rail Road stopped when the State stopped payments of estimates, but denied that his share of the profits was $8,000. He averred, that when he and others took the Rail Road contract, it was considered too low and would prove a losing operation; that during the first six months they did not receive sufficient estimates to pay expenses, and that it was necessary to raise funds out of their own private means. He averred that Campbell never advanced anything towards said contract; that soon after the sale of his Canal interest, he, Campbell, left the country for six months; that during his absence he never wrote to him, Wilson, nor did he ever express a wish to become interested in it until one month after his return, at which time and not before, he, Wilson, and the company were receiving sufficient estimates to pay the expenses.

He admitted, that each were to be equally interested in said Rail Road contract, with the express understanding, however, that each should contribute an equal amount to

prosecute said work. He denied that there ever was any agreement that the superintendence of one on the Canal should be an equivalent for that of the other. on the Rail Road.

He averred that they were to share equally in said Canal contract, and that the $1,100 were not received as profits, but as purchase money. He denied that Campbell fulfilled his agreement, as he did not notify him that he considered himself interested in the Rail Road contract, nor did he ever advance any funds to aid in it. He denied that he ever received $8,000 as profits, but only between $3,000 and $4,000 in Illinois scrip, and admitted that he has never paid any to Campbell.

He then alleged that the matters in said bill are remediable at Law and not in Equity, and prays the same benefit of this defence as if he had demurred thereto. He denied any other or further knowledge.

A replication was filed February 4, 1842.

The following is an abstract of the depositions.

*Henry L. Owens, Complainant's witness:*—Knows the parties: In the spring of 1838, the defendant informed the witness that Campbell, John H. McFarrin and Norman McFarrin were bidding for contracts on Central Rail Road and also that the witness with the defendant, C. H. Perry, Henry Weed, E. F. Weed, and N. W. Manville were also bidding; that they were bidding together, and that if either or both obtained bids, each were to be equally interested. McFarrin, complainant, and the defendant were interested in the Canal contract; the defendant told witness that he had sold out his interest in the same for ten or eleven hundred dollars to complainant and McFarrin. On the day of Rail Road letting, the defendant told the witness that he and Campbell were to retain equal interests in the Canal and Rail Road contracts, if either of them got any work on the Rail Road; that the defendant was to take charge of the work on the Rail Road and complainant on the Canal, and their time was to be set off each against the other. Four sections were allotted to the defendant and others of the company;

the name first used by them was N. W. Manville & Co.; after-wards Perry, Wilson & Co. The defendant told witness that he had offered complainant $100 for his interest in the Rail Road contract, but complainant would not take it. This was two or three weeks after the letting aforesaid.

In 1839, complainant sold out his interest in the Canal, and with one W. Seward took a sub-contract on one of the sections obtained by N. W. Manville & Co. and continued there until about the time Perry, Wilson & Co. suspended work on the Rail Road.

*Cross-Examination.*—Does not recollect advising the complainant to bring this suit ; thinks he never did. In the winter of 1839, witness had conversations with the complainant in regard to the complainant and said defendant's business on said road, in which he informed complainant what he had heard the defendant say, witness' interest with Campbell was got by purchasing Seward's interest in the sub-contract under Perry, Wilson & Co.; witness sold his interest to Perry, Wilson & Co, in August or September, 1838. Estimates had been taken every month by the Engineer ; thinks no moneys were received until after he sold out, and about three months after commencing the work ; witness had one-sixth part of original contract, and received of Perry, Wilson & Co. for his share, $500 ; the advances were made by each individual, but not in equal proportions ; debts were contracted by the company ; does not know how much each advanced ; thinks Wilson advanced 500 dollars in cash and other property ; others advanced teams, wagons, &c.; does not know amount of outstanding debts of Co. but thinks they were considerable ; witness and Manville advanced about $600 ; Manville sold his interest to Perry, Wilson & Co. at same time Wilson did ; thinks that part of the articles advanced by witness and Manville were returned to them ; they were paid $600 in cash, balance in paying outstanding debts against them. The original contract was not considered by him or the company, as an unprofitable one ; the amount of the whole contract was $150,000 ; witness sold out his interest because

he was told Manville would have to leave; and he and Manville were getting behind in their advances, and Perry, Wilson & Co. promised to aid them in obtaining another contract the next year. Defendant had also agreed to aid witness and Manville with funds, but had failed to do so, alleging inability; took a sub-contract under the company about a year after selling out; the complainant took his sub-contract in February, 1839; understood that complainant was part of the time on Rock river, sick, after the letting, and before taking the sub-contract. In December or January, 1841, had difficulty with the defendant about a hog, but he supposes it was then settled.

*Re-Examination in chief.*—The above conversations between the defendant and witness, were caused in consequence of discovering an intimacy between the complainant and the defendant on the day of letting, which led him to fear something was going on prejudicial to his interest, and he was then led to make inquiries of the defendant.

*John H. McFarrin, Complainant's witness.*—Is acquainted with parties to suit; was a partner with them in the Canal contract; partnership commenced in June or July, 1838; were equal partners. Defendant sold out to the complainant and witness all his interest in the Canal contract, section 193, consisting of every thing belonging to the firm. This was about July, 1838, for the sum of $1100 over and above what he had invested. The $1,100 was to be paid on the completion of section 193. Defendant drew goods, &c. out of the store of the complainant and witness, to the amount of his investment; the whole $1,100 has been paid in full; it was all paid before the section was completed, excepting eighty-five dollars. Witness purchased out Campbell's interest, 29th of Jan. 1839, paid him $1,000 dollars for it; in settlement with the complainant, he bore his proportion of said payment to Wilson. At the time witness purchased complainant's interest, about $800 was unpaid of the $1,100. Defendant was not present at the time of this sale; he knew it about a week after, and made no objection. After the Canal contract was completed, and after the suspension of

work on the Rail Road, in the fall of 1841, the defendant told me that as Campbell was sick on Rock river,. and not being on the work, he did not consider the complainant entitled to any thing, but he had offered complainant $100, and rather than have a suit about it, he would give $800. In the summer of 1838, a note for $500, signed by the complainant and defendant, was given to Ezra Dongan; it was paid by the defendant in the fall of 1838. Complainant superintended the Canal contract, except when sick, three months; there was no charge made of lost time; does not know that the complainant was out of the State in 1838, or 1839; if so, thinks he would have known it.

*Cross-Examination.*—When the defendant sold to the complainant and witness he had a right to draw on us to the amount invested by him in the Canal contract, and he did do so. The articles he drew were charged to his individual account; they were in part payment for the purchase of his interest in the canal contract. The $1,100 witness considered a debt due from us to the defendant; do not know of complainant ever advancing any thing on the Rail Road contract of Perry, Wilson & Co.

*Re-Examination in chief.*—Complainant and witness, he considered, had about $1,500 or $2,000 invested in the Canal contract, at the time of purchasing out the defendant.

*C. H. Perry, Defendant's witness.*—Knows the parties and of the Canal contract in 1838; the company were complainant, defendant and McFarrin; does not know of the company proposing for work on the Central Rail Road; knows of the sale of the defendant's interest in Canal contract, for $1,100, and defendant's obtaining a contract on the Rail Road in June, 1838, in company with Manville, H. L. Owens, H. Weed, E. F. Weed, and witness. It was his opinion that the contract would be profitable to some extent; it was about six or seven months after commencing work, before estimates were received from the State to pay expenses.

The money to carry on the business was advanced by the members of the firm, and on the credit of the firm; the

complainant never did advance any money to carry on the work; if he had, witness would have known it; at the time of commencing work on the Road, supposed complainant to have been at La Salle, on his Canal contract; complainant was not present at the time of commencing the work, nor at any time after as a partner or person interested; thinks he was not near the work for several months after it was commenced; thinks he was on Rock river sick. It was about five weeks after commencing work on the Rail Road before an estimate was received. Does not know how much defendant advanced to carry on said work, nor how much he received on final settlement; what he did receive was in State scrip of Illinois. The company took goods, &c. of complainant and McFarrin, on account of defendant; they told witness they were owing defendant a considerable amount, and he supposed it would be an object with them to pay in this way, as otherwise they would, in the end, have to pay cash. The company paid defendant for these things.

*Cross-Examination.*—Was a member of both firms, N. W. Manville & Co. and Perry, Wilson & Co. We got the contract in June, 1838, in the name of N. W. Manville & Co., composed of N. W. Manville, H. L. Owens, James Wilson, H. Weed, E. F. Weed, and C. H. Perry; a short time after work commenced, defendant bought out Owens and Manville's interest in the contract for the rest of the company; witness then formed under the name of Perry, Wilson & Co. which was composed of defendant, witness, H. Weed, and E. F. Weed, each owning an equal interest in the contract. All the books witness knows of, of the company, are in witness' custody. Understood that complainant sold out his interest in the Canal contract to McFarrin, but do not know if defendant knew of such sale, or advised it. Don't know the precise profits on said contract; witness' share, one-fourth, was between $6,000 and $7,000; defendant was originally entitled to one-sixth, but he increased this by buying out E. F. Weed. Does not know how much he made; on 8th of March, 1839, the company let a sub-contract to complainant

and E. W. Seward; six months after this the contract was abandoned because the State failed to pay; received $6,000 of the State in Illinois scrip for stopping the work, considerable of which was divided among our sub-contractors: does not know how much defendant received as his share; complainant was not on the contract from the commencement in July, until the winter following; he was sick on Rock river some time, and he had been back several weeks before he came to our side of the river. Defendant sold out his interest in the Canal contract about time of commencing on the Rail Road. Does not know when complainant sold out his interest; he continued on the sub-contract from March 8, 1839, until the work was abandoned. Am not related or connected with defendant in any manner. After letting sub-contract to complainant and Seward, defendant stated to witness that complainant had set up a claim against him in the Rail Road contract; that prior to the letting he had an understanding with complainant that they were to put in separate bids and to be mutually interested in what might thus be obtained; defendant in connection with the company obtained work, but the complainant had forfeited all claim to any interest with him, as he had never incurred any responsibility, or advanced any money on account of the same, but had waited till he had found the job profitable, and he, defendant, did not consider that he had any recourse or claim on the complainant, had the job turned out unprofitable.

*John Wilson, Defendant's witness.*—Knows the parties to this suit, and of a company composed of McFarrin, complainant and defendant, owning a contract on the Canal, in June, 1838. Does not know of said company proposing for work upon the Central Rail Road. Thinks they did not; knew of the sale of defendant's interest for $1,100, to the complainant and McFarrin, and also of the defendant's procuring work on the Rail Road in connection with Manville and others. At the time of commencing work on the Rail Road, the complainant was on the Canal in La Salle. Knew of defendant's selling his Canal interest to the complainant and McFarrin, for $1100. Was present at the time,

and offered defendant more, but he declined, saying they were old partners and had a preference.

*Cross-Examination.* Was not a member of either of the firms of N. W. Manville & Co. or Perry, Wilson & Co ; am the brother of the defendant, but have no business connection with him.

*Robert Mead, Complainant's witness.*—Knows the parties to this suit, and in February, 1839, heard the defendant tell the complainant that he, complainant, had better sell out his contract on the Canal, and take a sub-contract under Perry, Wilson & Co. upon the Rail Road.

*C. H. Perry, Complainant's witness, second deposition.* Knows the parties. In the winter after the Rail Road contract was procured, had a conversation with the defendant, who told witness that complainant had set up a claim in his, defendant's, contract on the Rail Road; that they had an understanding that both were to bid at the Rail Road letting, and each to share equally in whatever work they might obtain; defendant stated that the complainant had been absent a considerable time after contract was taken ; had furnished no capital; incurred no risk, and he, defendant, was under no obligation to give him an interest in the work. Thinks the defendant received $6000 or $7000 as profits on the Rail Road contract; never heard the defendant say any thing on the subject.

*Cross-Examination.*—Knows of the defendant being interested in one third of the Canal contract in 1838; he sold out his interest in it in the fall of 1838 to the complainant and McFarrin, for $1,100. Knows he was paid part of this ; does not know that he received all. In a conversation with the complainant at Ottawa, he stated to me that the defendant was still to retain an interest in the said contract. Has heard the complainant and McFarrin often urge the defendant to purchase goods at their store ; they have often urged me to buy on witness' account, as they went in part payment of the amount they owed the defendant. Has understood from both McFarrin and the defendant, that the defendant received a note on Pearl & Hyatt for $500 of McFarrin, to

be applied on what the complainant and McFarrin owed the
defendant; and also the defendant's part of a carriage was
to be applied in the same way.   Also, that defendant re-
ceived a note against N. W. Manville and others from the com-
plainant and McFarrin for $1000, which the defendant was
to take as a part of said indebtedness due him at about $600.
Don't know of defendant's receiving any money of com-
plainant and McFarrin on sale of his Canal interest to them.
Knows the money defendant advanced on Rail Road contract
was his own money; he also furnished goods and pro-
visions procured from the complainant and McFarrin; also
goods procured of witness.   He also purchased a stock of
goods in St. Louis on his own credit for the company.   The
complainant never furnished any money or thing to the
Rail Road company; if he had, should have known it, as
witness financiered for the company.

On the 11th May, 1844, the Court rendered a decree,
pronouncing the complainant and defendant to be partners
in the contracts on the Rail Road and Canal, as set forth in
the bill of the complainant; that the defendant has received
whole amount of the profits, and ordering an account.   The
cause was referred to S. G. Patrick, a special Commission-
er, to take an account, hear evidence, examine parties and
books and papers, and make report thereof.   He subse-
quently filed his report in Court.

The Commissioner set forth that the evidence was un-
satisfactory in its character; that many of the books and
papers of the Rail Road firm have been destroyed by fire;
that in the Canal contract the parties and McFarrin were
equally interested, and so far they have mutually shared
their respective interests; that from the evidence of Perry
and others, the defendant obtained in June, 1838, a contract
for work on the Central Rail Road, in company with five
others, as equal partners; that subsequently two of original
partners, to wit: Owens and Manville, were bought out by
the company, and that the complainant and defendant, ac-
cording to the interlocutory decree of the Court were equal-
ly interested in one fourth of the whole Rail Road contract;

that the defendant subsequently bought out the interest of C. Weed, thus becoming owners of one half the whole contract; that there was no evidence to show when defendant bought said interest of Weed, or how much he paid for it, nor whose funds were used in paying Weed, and no evidence was introduced on which such an account could be stated. That the day book and ledger admitted in evidence showed that the defendant was charged with $25,286·67, and credited with $16,230·68, which leaves a balance against defendant of $9,055·99, which, assuming the books to be full and correct, the Commissioner proceeded to say would be the amount of the defendant's individual profit on said contract; that the books contained no memoranda of the distribution of damages to members, of which there is evidence that it amounted to $6000 in Illinois scrip; that the books showed no distinction in the charges and credits to the defendant at the different times he owned different amounts of interest; that the books furnished no sufficient data on which to rely, and that the bill and answer, depositions and parol evidence before the Commissioner, constituted the only reliable evidence. That from the best evidence the profits of the defendant were $6,500 on one fourth of the contract, and which came into his hands. Deduct for fourteen and three fourth months' absence of the complainant $737·50-100 from $6,500 left balance of $5,672·50, one half of which is charged to the defendant as due to the complainant; that the last payment on the Rail Road was received 28th March, 1840, from which time add interest at six per cent. on half the amount of $5,762·50 is $768·31, which in the aggregate amounts to $3,649·56, the amount due complainant by the defendant. He further stated that there was evidence of $6,000 in Illinois scrip having been received as damages from the State, but that there was also evidence that a considerable amount of same was paid out for indebtedness, and no evidence that any of it was received by the defendant; that there is some contrariety in the evidence as to the value of the scrip, but that this value was immaterial on account of the uncertainty of the amount of same received by the defendant on final settlement.

At the September term, 1844, the Hon. Thomas C. Browne presiding, after several motions were entered and overruled by the Court, it was ordered that the aforesaid sum of $3,649·56 be paid by the defendant below within sixty days, and that in default of such payment, an execution issue.

*O. H. Browning & N. Bushnell*, for the plaintiff in error.

I. The other persons interested should have been parties to the bill.

All parties interested in an account should be made parties to the bill. 1 Story's Eq. Pl. 167, 167*a* and *note ; Hopkirk* v. *Page*, 2 Brock. 20.

Where the *defendant* is interested in having other parties before the Court, or where without them, he might be held for more than he ought to pay, or embarrassed by their absence, he may object that they are not before the Court. Story's Eq. Pl. §§ 136, 138, 141, 164.

Here the amount to be paid by Wilson depends upon an account between Wilson and the other parties, which alone can determine the profits received. Story's Eq. Pl. §§ 127 –9, 172–3, 177 ; *Marr* v. *Meilacky*, 1 Mylne & Craig, 559 ; *Bray* v. *Fromont*, 6 Madd. 5.

On a bill in Chancery against the indorser of a promissory note, the defendant has a right to insist that the other indorsers be made parties. *Riddle* v. *Mandeville*, 2 Peters' Cond. R. 268.

The principle on which Courts of Equity require all parties before the Court is to prevent future litigation. All persons interested in the subject matter of the suit must be before the Court in order that complete justice may be done in one suit. *Mandeville* v. *Riggs*, 2 Peters, 487 ; *Caldwell* v. *Taggart*, 4 do. 190.

II. As it was a bill for the winding up of a partnership, not only should all of the partners have been before the Court, but the bill should have prayed the dissolution of the partnership. *Loscomb* v. *Russell*, 4 Simons, 8.

III. The bill shows an attempt on the part of one partner to bring a third person into the partnership—this cannot be done. Story on Partn. § 5 ; Gow on Partn. 4, 5. *Mur-*

ray v. *Bogart*, 11 Johns. 318; *Kingman* v. *Speers*, 7 Mass. 235. And though one partner may charge his own interest in the partnership in favor of a third person, the latter will take his interest subject to an account between the partners —the bill should have shown that the parties had accounted, for till then he can have no right to an account against Wilson. Gow on Partn. 5, 94, 96, 110; *Bray* v. *Fromont*, 6 Madd. 5; Story on Partn. §§ 307, 8, and note.

It is in this case and under the second head in principle, like the case of the assignee of one partner or a purchaser of the interest of one partner, on execution—he takes only the surplus after payment of debts, and of course requires a previous settlement of the partnership affairs and the ascertaining of the surplus.

IV. The bill does not show any valid agreement for a partnership—it shows no consideration for the supposed contract—the whole contract was inchoate and preliminary. Gow on Partn. 10, 11; *Dowlin* v. *Ward*, 6 Johns. 194; *Wilbur* v. *Howe*, 8 do. 444; Chitty on Contracts, 8, 9, 13, 14, 40; 2 Kent's Com. 465; *McNeil* v. *Read*, 28 Eng. Com. Law R. 265; 3 Kent's Com. 25; *Trimble* v. *Green*, 3 Dana, 356-7; *Violet* v. *Patton*, 5 Cranch, 142; *Minturn* v. *Seymour*, 4 Johns. Ch. R. 500.

The terms of the contract were uncertain and indefinite. Certainty in the terms is essential, when the Courts are called on to enforce it specifically.

V. If there was any consideration for the contract, it consisted in the agreement of Campbell to join with some other company and bid—the object of the contract was to increase their work or their chances of procuring work on the railroad. The performance, therefore, of Campbell in this particular, is of the essence of the contract—it goes to the consideration by virtue of which only can the contract be supported. He should hence have averred in his bill a performance in this respect, or a readiness to perform. This he has not done, and he must fail. Suppose Wilson had not bid, and Campbell brought an action at law to recover dam-

ages ? *Tharp* v. *Tharp,* 1 Salk. 171 ; 2 Kent's Com. 465 ; *Trimble* v. *Green,* 3 Dana, 356–7 ; *Porter* v. *Rose,* 12 Johns. 209 ; *Parker* v. *Parmelee,* 20 do. 130 ; *Barry* v. *Alsbury,* 6 Litt. 151 ; *Dana* v. *King,* 2 Pick. 155 ; *Hunt* v. *Livermore,* 5 do. 505 ; 1 U. S. Dig. 538, § 27 ; *Bordenave* v. *Gregory,* 5 East, 107 ; *Kane* v. *Hood,* 13 Pick. 281 ; 1 Saund. 230, note 4 ; *Dakin* v. *Williams,* 11 Wend. 69 ; and these conditions precedent are always considered strictly in favor of those for whose benefit they are made. *Gray* v. *Gardiner,* 17 Mass. 188 ; 6 Cowen, 669.

And the party seeking to enforce the contract and to procure the benefit of it in Equity, must show the performance on his own part of all the matters entering into the mutual consideration of the contract. *Colson* v. *Thompson,* 4 Peters' Cond. R. 143 ; *Bates* v. *Wheeler,* 1 Scam. 54 ; *United States* v. *Robinson,* 9 Peters, 319 ; *Trailor* v. *Hill,* 2 Gilm. 364 ; 1 Barb. & Har. Dig. 304, §.3, 4 ; *Modistet* v. *Johnson,* 2 Blackf. 439, 440 ; *Morgan's heirs* v. *Morgan,* 4 Peters' Cond. R. 120, 123 ; *Fitzpatrick* v. *Beatty,* 1 Gilm. 467–8 ; *Harris* v. *Knickerbocker,* 5 Wend. 638.

The original practice was to send parties to the Law Courts to see whether there was a valid contract.

VI. This is an attempt to enforce the specific execution of an alleged contract for a partnership.

A Court of Equity will never do this except under peculiar circumstances and to prevent fraud—as in cases where a party was vested under the contract, and been put in a condition in which he cannot be put in *statu quo,* and he seeks relief. Story on Partn. 284, § 188 ; Gow on Partn. 109–11, and notes (y) and (1.)

And never where the partnership may be dissolved at any time by either of the parties. *Hessy* v. *Birch,* 9 Vesey, 357 ; Gow on Partn. 109–11.

And where no time is fixed for the duration of the partnership, it can only exist during their mutual pleasure. Story on Partn. §§ 48, 307–8 & note ; 8 Kent's Com. 53 ; *Featherstanaugh* v. *Fenwick,* 17 Vesey, 307–8.

In this case, the partnership could have been dissolved at any time. Crashaw v. Maule, Swanst. 521, 525.

If it is said the partnership has been dissolved, we reply that it has never been one—that Campbell, so far as any thing from him appears, ever denied it—he never did any thing under the contract. Wilson always repudiated it and him as a partner—so that even if there was a contract of partnership, there has been no partnership; and now Campbell seeks to force himself on Wilson as a partner.

But even in cases where Courts of Equity will enforce contracts of partnership, they will not decree an account for the time the party ought to be admitted; as to the time past the party will be left to his remedy at law. Gow on Partn. 11; Anon. Vesey Sen. 729.

There is no evidence of a legal partnership. A mutual contribution of something of value is of the essence of the contract. Story on Partn. §§ 3, 4, 5, 6, 8; 3 Kent's Com. 25; Collier on Partn. 2, 4.

Where a partnership is denied, it will not be inferred from equivocal circumstances. 2 Barb. & Har. Eq. Dig. 337, § 16.

Nor will the Court decree on a different contract admitted by the answer—nor on proof of material matters going to the consideration of the contract not set out in the bill. The complainant must recover on the allegations of the bill and the evidence thereof, or not all. Thompson v. Todd, 1 Peters' C. C. R. 380; 1 Johns. Ch. R. 148–9; 6 Johns. 560; 5 Wend. 949–50; 1 Johns. Ch. R. 653–5; 10 Peters, 209.

VIII. 1. The Court erred in decreeing an account as to two partnerships, made up of different members. 2. In decreeing an account as to the canal contract, as the bill was framed only with reference to an account on the railroad contract. 3. The Court erred in decreeing an account on the the canal contract in the absence of McFarrin, who was also a partner with Wilson and Campbell on that contract.

IX. The Court erred in confirming the Master's report. 1. The report was heard on testimony not properly authen-

ticated. The Master erred in allowing Campbell one-half of one-fourth of the profits, when he was at most entitled to one-half of one-sixth of the profits.

*H. O. Merriman,* for the defendant in error.

The objection to this bill that there was a concurrent condition in the copartnership agreement, unperformed on the part of complainant, is unavailing for the reason that complainant's right to an account depends upon the acts done under the agreement and not on the agreement itself. If the funds used in the business of the firm of Perry, Wilson & Co. put in by Wilson were the joint funds of complainant and defendant, he is entitled to an account.

A copartnership may exist between individual members of different firms, and the firms of which they are respectively members have no interest in the accounting. 3 Kent's Com. 51–2.

There is nothing in the objection that the other members of the firm of Perry, Wilson & Co., and that McFarrin, a copartner with complainant and defendant in the canal contract, are not made parties, as those firms were fully dissolved before this bill was filed, and a full settlement had also taken place between the several members of the respective firms, and Campbell had received the balance due him, on sale of Canal contract, and Wilson had received the balance due him out of Rail Road contract. Hence, no further accounting or settlement is needed, except as between complainant and defendant. Whenever the object of a joint undertaking is completed, it is a dissolution of the copartnership. Story on Partn. § 280.

By an application of these principles to this case, if the parties had a joint interest in the funds used on canal and rail road, there must be a decree for complainant. This is proved by a reference to the proof in the record.

*O. Peters,* also, for the defendant in error.

The allegations of the bill are sufficient. The bill is in-

artificially drawn, but the Court will look to the substance, and see that such a case is made by the bill as will entitle the party to the relief sought.

The agreement between the parties as set out in the commencement of the bill, is introduced only as an inducement to the partnership, and as explanatory of it. No relief is sought by virtue of this agreement, but by virtue of the partnership which resulted from the agreement. We claim a participation in the profits of the partnership, and the only effect of the agreement is to define the nature and extent of the partnership. The complainant's bill would have been sufficient without any statement relative to the agreement. It might have been entirely omitted.

Again, the objection that there should have been other parties to the bill, is not well taken. In determining who shall be made parties, it is not necessary to inquire whether all persons interested in the subject matter of the suit are made parties, but only whether those are made parties who are interested in the object of the suit. Story's Eq. Pl. § 72; *Whiting* v. *Bank U. S.*, 13 Peters, 11.

The object of this suit is to charge one-half of the profits of the partnership existing between C. & W. No other persons have any interest or concern in the division of these profits; so that the object of the bill is fully accomplished by a litigation between the present parties.

The other members of the firm of Perry, Wilson & Co. cannot be called upon to execute the decree that may be rendered in this case. Story's Eq. Pl. §§ 74, 76, *a*, *b*, *c*, 81, 153, 167 *a*, 189. The proof sustains the allegations in the bill. The Master's report sustains and shows that the defendant in error is entitled to one-half of the profits of the partnership.

It is too late to take exceptions to the Master's report. The exception should have been made to the Master before his report was made to the Court, and objection cannot be made at the hearing, but the Master's finding of the facts, and the conclusions drawn by him must stand. *Meth. Ep. Ch.* v. *Jacques*, 3 Johns. Ch. R. 78.

The Opinion of the Court was delivered by

TREAT, C. J.* One branch of this case—that relating to the canal contract—is easily decided. The bill states that Campbell & McFarrin purchased the share of Wilson in this contract, but alleges a secret arrangement between Campbell and Wilson, by which the latter still retained an interest in the contract. The answer admits the sale, but denies the private agreement charged in the bill. There is no proof that any such agreement was made; on the contrary, it clearly appears that the sale was *bona fide*, and absolute in its terms. There was then no partnership between the parties in this contract to be adjusted by a Court of Equity.

The other branch of the case relates to the rail road contract. The bill does not seek the specific performance of an agreement for a partnership, but it proceeds on the ground that there has been a subsisting partnership, in the settlement of which the aid of a Court of Equity is necessary. A mere agreement to form a partnership does not of itself create a partnership. The parties must enter on the execution of the agreement before the relation of partners exists between them. While the agreement remains executory, if one of them refuses to carry it into effect, the only remedy of the other is by an action at Law for the violation of the agreement, or by a bill in Equity to enforce specifically its performance.

It was probably the understanding of these parties, that each should, under certain circumstances, become equally interested in whatever contract either might obtain on the rail road. The question is, was this understanding so carried into effect as to constitute them partners in the contract procured by Wilson. We are clearly satisfied that no partnership in fact existed between them in the execution of this contract. The acts of the parties afford the strongest

*CATON, J. took no part in the decision of this cause, it having been removed by change of venue from the Circuit where he was formerly the presiding Justice.

Wilson v. Campbell.

evidence that they did not regard themselves as jointly interested. In the prosecution of the work under the contract, Wilson performed all the services, made all the advancements, and incurred all the responsibilities. Campbell claimed no control over the contract, nor in any manner concerned himself about its performance. Wilson did not recognize him as a partner, but on all occasions denied that he was such. The offer of Wilson to give Campbell one hundred dollars for his interest in the contract—proved by the witness, Owens—was made before the work commenced; and his subsequent statement to McFarrin no doubt referred to the same proposition. After Campbell sold out his interest in the canal contract, he took a sub-contract from Wilson and his associates for work on this very rail road contract. If a partner of Wilson, why did he not join him in prosecuting the contract to completion instead of becoming a sub-contractor under him.

The statements of the bill respecting the objects of the partnership, and the mode of conducting it deserve consideration. These statements are, that the sale of Wilson's share in the canal contract was not real, but, as between Campbell and Wilson, an expedient only to enable them to procure means and credit at the store of Campbell & McFarrin to prosecute the rail road contract, and that Wilson should superintend the work on this contract and Campbell that on the canal; in other words, they were partners in both contracts, and the services of one were to be an equivalent for those of the other, while the means for carrying on both contracts were to be obtained from the firm of Campbell & McFarrin. The proof shows conclusively that these allegations are untrue. The sale was absolute, and Wilson from that time ceased to be interested in the canal contract. The sale was made about the time the work on the rail road was commenced, and Campbell could not therefore perform any services on the canal that would enure to the benefit of Wilson. By the terms of the sale, Campbell & McFarrin became largely indebted to Wilson, and the moneys and

goods received by him were in liquidation of this indebtedness.

The evidence fails wholly to make out a case of partnership, and if Campbell has a cause of action against Wilson, it is for a violation of the agreement to form a partnership, to be enforced by a suit at Law.

The Circuit Court erred in decreeing that a partnership existed, and consequently all of the subsequent proceedings in the case were erroneous.

The decree of the Circuit Court is reversed with costs, and the bill dismissed.

*Bill dismissed.*